The Fourth District Appellate Court of the State of Illinois has now convened. The Honorable Catherine E. Zienoff presiding. Thank you. Now, good morning, counsel. This is case number 4-240352, Savannah Teel, formerly known as Savannah Kandor, v. Illinois Department of Corrections, Illinois Human Rights Commission, and Illinois Department of Human Rights. Would counsel for the appellant identify himself, please? Yes, my name is John Doak, and I am the counsel for Savannah Teel, formerly known as Ms. Kandor, the petitioner and appellant in this case. Thank you. And would counsel for the appellee identify himself also? Yes, Your Honor's Assistant Attorney General Dave Neumeister on behalf of the respondents. Thank you very much. At this time, Mr. Doak, you may start your argument. Thank you, Your Honor. May it please the court, counsel. It's my pleasure to represent Savannah Teel, the petitioner appellant in this cause of action. Generally, I'm not going to get into a lot of facts. I know the rules state not to do so, but I just kind of want to set the stage. Ms. Teel was a correctional officer at the Hill Correctional Center in Galesburg, Illinois. At the pertinent time, she sought an accommodation when she was in her eighth month of pregnancy for no inmate contact. As the evidence has shown, this is routinely granted to workers' comp injured persons to get a no inmate contact accommodation. They're generally either assigned to the control room or the armory. In this instance, when Ms. Teel... Mr. Doak, before we go too far along, I just want to make sure I understand the true scope and context of this litigation. Certainly. Is it true that this seven-year dispute, six years of actual litigation, is based basically on your client being asked by a supervisor to take an inmate to the garbage? No, that is not the case. So what is it that really precipitated all of it? So that happened three weeks prior, okay, when she was in her seventh month of pregnancy. The administrative law judge brought that up because he did not like my client, and that's clear. He does not like... Well, I'm just talking about the fact that we have in the about... or Stickle about who's going to take out the inmate who's going to take out the garbage. And Stickle says that's below my pay grade. That's all true, isn't it? That is true, yes. Okay. And so eventually, your client is the one who is directed to escort... She doesn't have to do anything. She just escorts the inmate to the garbage. Right. She declines to do that, and ultimately is ordered to do so because the warden actually has to get into this. And according to the warden's testimony, she had never had to get involved in something of this minor nature before, but she did because there was no sway in your client's position. She was not going to escort the inmate to the garbage. Now, is there anything about what I've just said that is not part of the facts of this case? I believe that is not an accurate statement of the facts of this case because my client did not, on her own, refuse to escort the inmate. She was directed by her supervisor not to do so. Well, Stickle said don't do it. Right. And she had to follow her supervisor's directions. Okay. So did she then point out to the warden when the warden contacted her, oh, look, warden, I'm sorry. My supervisor told me I won't. I'll be glad to. She did. And she said that. I'll be glad to. And in fact, she went to do so. She walked up to the area to escort the inmate, and the inmate refused to allow her to do so because- Well, according to her testimony. Yes. Okay. Which has not been found credible by either the ALJ or the commission. Right. And again, this has nothing to do with the case. This case is about- It does, kind of, because, see, depending on the level of our review, we're supposed to defer to ALJ and the commission on findings of fact. Is that a true statement of the law? That is a true statement as to the law on the second issue as to whether or not the indirect analysis of McDonnell Douglas is applicable. If that is applicable, that is the correct statement. Our position is that this is a direct evidence case. Because it is a direct evidence case. Before we get into that, wasn't it part of the facts that there were accommodations made for your client with respect to not being around or needing to carry a firearm and also being able to carry a glucose monitor? Those were doctor orders that came in and that accommodated, isn't that correct, by her employer? Yes. And wasn't it shortly after the incident that Justice DeArmond just referred to that another doctor's order came in that she was to have no contact with inmates? Isn't that correct? Within a week or so after that. Three weeks. Three weeks. Okay. Within a short, very short period of time. Yes. And let me give you the... And so, is there not also part of the record the fact that she articulated a fear of being near inmates in any way, shape, or in any respect? That is not correct. So that testimony was not correct? She did not give that testimony. Dorothy Warden gave the testimony that during the initial incident that Justice DeArmond was talking about, she discussed a fear of inmates being in direct contact. However, Dorothy, Warden Dorothy also says later, she specifically says that, I know her not feeling safe legitimately bothered me only because she was so far along in her pregnancy. And it wasn't that... You've already been corrected by, I think, the ALJ's finding and the commission in saying that you cherry picked that language out of context because that was actually what Warden Dorothy was saying about looking back, not what she was thinking at the time, but looking back now that they're that far along in the litigation, she understands and that that was undoubtedly something that was of a concern. But that was not the basis and both the ALJ and the commission find that was not the basis for her determination that, gee, a prison guard who can't be around prisoners is probably a tough thing to accomplish. Well, first of all, it's not a tough thing to accomplish. And second of all, the cherry picking has everything to do with this case because that's how you prove direct evidence cases. You have testimony by the people. Well, but it has to, your direct evidence normally has to be direct evidence coming from someone in a position other than the petitioner. Well, yes. And in this case... Okay, there you are. Thank you. Warden Dorothy specifically said, these are the reasons that I did this. Now, the administrative law judge says, well, this is hindsight. That's exactly what happened in Holland versus Gee. The person testifying, the decision maker said, the more I think about this, this is exactly what my thought process was at the time. And that's the whole point of a trial. Why have a trial if I can't through the adversarial process, the give and take of litigation and cross-examination, zero in on exactly what the person's motive was. And Warden Dorothy never says that this is now a new made up thing. She was consistent all along. I just got her to expand on it and give more detail than what she gave to the Department of Human Rights. And she willingly said, this is what I was thinking at the time. And so this whole going back and forth and say, well, in hindsight, she's somehow giving some other testimony when it's absolutely consistent, but just expanded upon. And even when the administrative law judge acting essentially as the defense attorney tries to get her to back off of what she says, she doubles down and goes even harder on it. And that's in our brief. Commission found Dorothy's concern was only a reaction in hindsight to an issue injected by the petitioner herself over whether she could have performed her job as a correctional officer after she told Dorothy of a fear of being around inmates. In the commission's opinion, the evidence established Dorothy placed petitioner on paid leave of absence because one, she could not grant the petitioner's accommodation for a request of essentially no contact of any kind with an inmate. And there were no other assignments in the facility that could accommodate such a request. There is no documentation in her request for her doctor's note that says no inmate contact of any kind. It says no inmates. That's not the point. The point was, those are the findings. Yeah, those are the findings on the indirect evidence case. And on the direct evidence case, those statements that you're contesting are direct evidence. She had the Seventh Circuit case out of 1999 specifically says so. If it's positively related to her decision-making process, even isolated comments constitute direct evidence. And she never said in any way, perform, this is some sort of a hindsight that she's now changed her mind as to why she did it. The testimony was, this was her thinking. She was thinking about the safety of the baby. She was thinking of two people instead of just one. And I don't know what it is that began this, because as I said in my response, there's kind of a twilight zone to this whole thing. And it's very common in pregnancy cases. Well, counsel, if I could, I'm sorry for interrupting, but we don't have a lot of time left. Let's turn for a minute to the indirect analysis. There are a number of elements that have to be there, but I want to focus on one. How was Hughes a sufficient comparison or comparator when he didn't express like your client, and again, I will refer back to the findings, a fear of being around inmates. And furthermore, he had a different supervisor who was involved in the discussion of the accommodation after his injury. Well, the decision was made by the same person, Warden Dorothy. There was a reference to a Mr. Price in Springfield who gave some additional comment, but Mr. Hughes, Mr. Calhoun, who's instead of no direct inmate contact was no work with the general population. You have Tammy Moore saying we did this in 2017, the year before, and 2018 routinely. And the warden saying, yes, we do it all the time, not in 2014, because that was when she just started, but she couldn't say when it came into full force that they made accommodations. She said, there's no distinction here. None. There is no distinction. What it comes down to, she was just thinking of two people instead of one. Now, when we get into those similarly situated situations, Anthony Hughes had the exact same restriction. And if you want to get into it. He could be around inmates. I mean, you have to pass close to, or certainly in proximity with inmates as you're coming and going or walking within the facility to a certain assignment. I don't have enough water today. Sorry to assert. Yes. So, yes. First of all, he had the exact same restrictions. The administrative law judge made up the notion of a distinction between him being not having incidental contact. What Mr. Hughes specifically said is I may have incidental contact if I leave the armory to go to the restroom or to go to the vending machines. There was a restroom and there's testimony of the record in the armory. You don't have to leave to go to the restroom. There was a break room with vending machines in the armory. You don't have to leave. Hughes was on workers' comp leave before coming back, right? Pardon me? Hughes was on workers' comp leave before coming back, correct? Yes, he had an injured shoulder. And Price was the IDOC's workers' compensation coordinator, correct? Yes. So, when Dorothy initially declined to agree to the accommodation, it was Price who said, no, it's an accommodation that you need to consider making. So, you're saying, oh, it was just two people of the same position and they just disagreed? Is that what you're saying? I'm saying that in that case, it was workers' comp. And in our case, she was concerned about the baby. That's the distinction. That ignores my question entirely. And I think that's probably the problem why we've eaten up so much of your time is that getting you to answer the question directly seems to be a problem. So, I'll just stop asking questions. I'm happy to answer it. Go ahead, finish your argument. But with regard to those issues, I do want to point something out in response to what Judge Zenoff said about whether somebody has a fear. Because not only did Warden Dorothy say that that only bothered her because she was so far along in her pregnancy, but I think common sense tells anybody that if you're a correctional officer and you don't have a healthy fear of the inmates, you're not doing your job. Because if you don't have a healthy fear of the inmates, you will not be proactive. You will not be looking for instances that are potentially an issue. And my client, of course, disputes those issues with regard to whether there was a fear of the inmates. But we're stuck with the record we have and what the findings are. I don't think we need to get there because this is a direct evidence case. And in that direct evidence case, we can also go into this. Well, let me stop on that because I want to go back to comment about whether the fear of inmates is something that would say she does not meet the reasonable expectations of the job. The fear of the inmates only comes up in that original notice of write-up. It wasn't even a write-up, a notice of incident. Three weeks prior, if that's not meeting reasonable expectations of employment, she would have received a written warning, a verbal warning, a write-up of some sort. She did not. She was allowed to remain in her position. I'm mischaracterizing the reference to the fear of inmates. It precipitates, then, an order from the doctor. Then the warden has to take into consideration the comments that she has made in conjunction with an order now saying no contact with inmates and has to make the determination. Well, what exactly does that mean? Well, it must mean that she can't be around inmates at all because when suggested another alternative, she said, no, because I'll still be in the presence of inmates. So she made it clear that she could not, in her mind, could not be around inmates at all, a tough task for a prison guard, but then comes back with a doctor's order that says no contact with inmates. That then leaves the administration with the dilemma of, well, let's see, how do we put her in a position where she's not even going to see an inmate? And that, I would suggest to you, is what led to the conclusion by the ALJ and the commissioner that this was an accommodation that could not be met under these circumstances. Judge, I agree 100% that you have put forth what the administrative law judge's position was. That's not the testimony. The testimony was that the armory is where she was. We're not relitigating the case. We're deciding it whether the commission, let me finish Mr. Doe. Go ahead. We're deciding whether the decision of the commission and the ALJ meet the standard of review that we're provided. Your efforts at trying to create a claim of direct review is based entirely on the comment of your client. It's not based on the other evidence that both the ALJ and the commissioner have found more credible than your client. If we do not agree that this is a direct case, then we're left with determining whether under our standard of review the decision, not your disputed testimony, the decision meets the standard. And that's all we're left with. I understand your position. Let me give you mine. I am not relying on my client's testimony for the direct evidence case. I am relying on the four statements on page seven of my brief where she says, I didn't want something to happen to her with her being so far along in the pregnancy. It was more me being protective. I'm now worrying about two people instead of one. And ultimately that's what it comes down to, two people versus one. She then says I can't guarantee her safety single-handedly. That's where my mindset was past tense. Goes on, I know her feeling safe legitimately bothered me only because she was so far in her testimony. Those are the direct evidence components. It doesn't rely a thing on what my client had to say or whether or not she is deemed credible. If we flip sides and go the indirect testimony argument, now I have to give you the credibility issue. And I have to say manifest way to the evidence. This is clearly against the manifest way of the evidence. There was undisputed testimony, even warden Dorothy, that when you come into the armory, that's the only place you don't have contact. All the other places, control room, everything else, you come across inmates. When you come into the armory, they have a stand down and all of the inmates are required to go back so that they are during the count-ups. That's when the transfer occurs. She goes through absolutely no inmates, none. Then she gets into the armory. There's no contact with inmates in the armory. There cannot be inmates in the armory. And then when she leaves at the end of the day, same thing. It's the end of a shift change. All the inmates go back. They do the count and then she can go through and there's no inmates. Now who said that the best was Anthony Hughes? His testimony clearly established that. Dr. Warden Dorothy's testimony established that. My client's testimony established that. Against the manifest way to the evidence, the administrative law judge comes up and says she's going to see somebody somewhere and it's going to freak her out. Come on. That's what this is about. His only basis is to say she was afraid. Warden Dorothy's the only one who said she was afraid. And she said that it was afraid in the context that it only mattered when she's that far along in her pregnancy. And that's what her decision was based on. I see that I have 15 seconds left to make a question. No, not left, but we are over. But that's okay. Justice Dierman, do you have further questions at this time? Of course, we have rebuttal left as well. Justice Fancel, any questions now? No. All right. Thank you, Mr. Doak. You will have time for rebuttal. Mr. Neumeister. Yes. Thank you, your honors. Again, Dave Neumeister on behalf of the respondents and may it please the court, counsel. First, I think we need to be clear that the direct and indirect methods of proving discrimination are not standards of review. Under either one, the standard of review is whether the commission's determination that IDOC did not discriminate against Ms. Teel based on sex or pregnancy was clearly erroneous. And it was not. Ms. Teel's post-hearing brief to the ALJ argued that she proved her case under both the direct and indirect methods. And that if the ALJ did not find for her under the direct, then she still wins under indirect. So she invited both of those analysis and the ALJ ultimately used the indirect. And in the end, the distinction doesn't really matter because the answer under both is the same. And it's whether IDOC discriminated against Teel because she was a pregnant woman. The outcome didn't depend on which method the commission ultimately used. Under either one, the answer is no. And if that includes the question of whether IDOC would have put Ms. Teel on leave, even if she wasn't pregnant, then as long as she insisted on no inmate contact, the answer is yes. And that's the direct evidence standard. The commission got those right. And it's determination under either one is reviewed for clear error. Well, why wasn't it clear error if the indirect proof was there? If Hughes was an appropriate comparator, and we've got the appellant belonging to a protected class who sought an accommodation that the accommodation was not provided, and Hughes was someone similarly situated. So why wasn't there clear error if all of those factors were present? Well, the evidence shows that the factors were not present. And the evidence all has to be considered in context. As to those factors, first of all, there's evidence that Ms. Teel wasn't qualified for the position if she wouldn't accept any inmate contact. That's one of the elements as well. And also, as we've discussed, or we, I haven't discussed it yet, but as was already discussed, Mr. Hughes was not a sufficient comparator for the reasons that we pointed out. He was coming back from workers' comp leave, and he had a different, somewhat overlapping, but ultimately a different chain of command as to his return to work under a no-contract restriction. And also, the evidence showed, and I think the ALJ realized this as well, Mr. Hughes was willing to accept a restriction that involved incidental inmate contact, where if he was walking past an inmate, you know, to get food or to use the facilities or whatever it might be, that was okay with him. But the evidence showed, and the ALJ found, that that was not okay with Ms. Teel. And that's why the indirect analysis fails. And the commission's decision, you know, was not clearly erroneous, and its underlying factual findings are entitled to deference. And when it comes to this evidence, the appeal is all about context. Ms. Teel, I think, is operating under the theory that just because Warden Doherty testified that the pregnancy factored into her decision, it's game over and nothing else matters. But it's not that simple. The law can't be that any mention of sex, pregnancy, or whatever protected class is at issue in an adverse employment decision creates essentially strict liability. And it seems to me that Ms. Teel's basically proposing a strict liability standard where any reference to a protected class in an adverse employment decision makes the employer liable. All of the it needs to be considered in context. And just because one piece of evidence might constitute direct evidence in a certain context, it doesn't mean that the rest of the evidence becomes moot. And your honors were correct that we really... Don't we need, excuse me, counsel, but don't we need to look at what was motivating her decision? And here, I mean, there's quite a litany that's set out in the brief and the record of comments that were made by the warden with respect to her concern about pregnancy, about the employee's pregnancy, about the baby. Why, you know, you're talking about context. Why wasn't this the motivating factor? How do we, what is there that we should look at also that would indicate that the ALJ was wrong about this? What should we look at that would indicate that the ALJ was wrong? Well, I mean, yes. Why wasn't this the motivating factor? There were other motivating factors. The pregnancy was a factor. There's no doubt about that. We don't contest that. But there were other factors as well. And first of all, and it all starts with this dispute about who was going to help the take out the garbage. And Stickle didn't want to do it, so it fell to Teal. And she didn't want to do it because she didn't want to go near inmates. And that's what Warden Doherty put in the incident report was Teal told Warden Doherty that she didn't... Her issue was fear of inmates. Teal didn't mention the pregnancy at that time. And most significantly about that, that's a fact that the ALJ and ultimately the commission found. It's a factual finding and it's entitled to deference under these standards of review. And there were other issues as well, as has been pointed out. There was an accommodation made for Ms. Teal's no firearm restriction. There was an accommodation made for her glucose monitor to come on site. So that's only part of what all needs to be considered. And also, this has been discussed also, but when Teal got the restriction, Mr. Kirsch put her in the armory right away just until a decision from higher up could be made about how to handle her situation because he didn't know what else to do at the time. And that was not meant to be a permanent assignment. And beyond that, if you give me just a moment, I'm afraid I need a bit of a drink of water also. Thank you. There was testimony, and this just wasn't Doherty's decision. She considered it along with Ms. Miller and Ms. Morgan, and ultimately HR and Springfield had to approve it about how are we going to address this? They tried hard to do it. And there were a number of positions that they considered, like the mailroom, which had some inmates, you know, incidental contact. The armory did require passing inmates to go back and forth. That's testimony that was in the record. The main gate had inmates around. The control room had inmates that passed by. And they considered all of these positions. But ultimately, Doherty offered Teal the chance to keep working if she would either drop the restriction or agree to at least some loosened type of restriction with inmate contact. They evaluated all these positions and decided that no, Ms. Teal is operating under this very strict interpretation of the restriction where she's not willing to accept any. So, we have to with a loosened restriction, or she can go on administrative leave. And Teal chose leave. And it's also important to remember, I think, this was not a termination context. Ms. Teal wasn't fired. She was placed on administrative leave. She ultimately came back to the department in another capacity that I believe was more clerical in nature. So, all those pieces of are factual findings that the ALJ and the commission made and that are entitled to deference under the agency standards of review. And all of it has to be taken into context and considered together. And this court should not ultimately adopt the strict liability standard where any reference to a protected class in making an adverse employment decision makes an employer guilty of discrimination. The commission properly avoided that result. It considered all of the evidence in context, such that this decision was not clear error. If your honors don't have any more questions, I'm prepared to stand on my brief with regard to anything else. Justice DeArmond, do you have questions? Justice Hansel? No. Okay. I don't have any further questions, Mr. Neumeister. Well, I would just thank your honors for your time and consideration and ask that the decision be affirmed. Thank you. Thank you. Mr. Doak, you have time for rebuttal. Thank you, your honors. Let me address directly this strict scrutiny argument that counsel is making because I wholeheartedly disagree that we're making that argument. First, you heard him in the beginning specifically admit that pregnancy was a factor in the crime. Then we have met our case, the burden shifts to them to plead a defense. In their actual response brief, they said what happens is the burden shifts over for them to have a same decision defense, but they didn't raise that defense. It was never raised in the pleadings. They put on no evidence of a same decision defense. They never argued in their briefs a same decision defense. In their reply brief, they simply mentioned that the burden shifts, but they never developed that argument. That argument is waived. It is not strict liability. It's we show a motivating factor, which they've admitted. In another part of their brief for direct evidence, they've admitted it because of the decision on Scott versus the social communities, a commission case where it says when you have a concern about liability because of the pregnancy, that's direct evidence. That's in the briefs. That argument goes nowhere. Again, then the next issue is this about prior accommodations. I think the inference is somehow that prior accommodations get rid of a pregnancy discrimination animus. You don't have to have an animus for pregnancy discrimination. You just have to treat somebody differently. When the Human Rights Act was amended, the legislatures expressed their frustration with that fact that people aren't getting that through. Why can we accommodate for workers' comp? Why can we accommodate for disabilities? Somehow, we just can never accommodate for pregnancy. In this case, yeah, she was accommodated for the diabetes with the have to keep in mind when these pregnancy cases come up. It's very rare somebody comes into work and says, oh, guess what? I'm pregnant. I'm going to have a baby. You're fired. That doesn't really happen. What happens is as you're progressing through the pregnancy, you start showing the restaurant cases start popping up. We can't have somebody who's showing. Come on. That just is going to be bad for our image. The later in the cases you get, the more you get into these strong majority of cases where somebody's concerned about the liability for the baby. Somebody's thinking about two. Somebody's concerned about a miscarriage because the person is working hard. Those are all the reasons why prior accommodations are irrelevant. The issue is, is this accommodation available? Could she have done it? The answer has to be an overwhelming yes. The question only can then be, was she qualified for the position? Of course, she was qualified for the position because both Tammy Morgan and Correctional Officer McLaughlin said, hey, we can't accommodate you because the warden says we can't. If you want to drop that, have your doctor take that off, you can go back to work. Why? Because fear apparently isn't the issue. If that were the issue, Tammy Morgan and Correctional Officer McLaughlin never would have said that, and they both admitted saying that, and that was their position. Go back to the armory. She was placed in the armory by her supervisor, not because those are permanent positions. The testimony was unrebutted. The armory is there for people who are on light duty. That's where they placed them, the armory, control room, and the mail room. Here, the armory was chosen because you don't have to have any interaction with inmates. That's why she was there. She was wonderfully happy to be in the armory. That's where she wanted to be under her light duty. It was only Dorothy, Warden Dorothy saying, I'm not going to accommodate her and place her there, that removed her from the armory. So, it was clear she could do it. They did it. She was there, and by the end of the day or the next day, she was yanked out of the armory. Why? When Mr. Hughes testifies, this is the place to be. This is the only place where there's no inmate contact, and there's no use of firearms required, and it meets every one of her accommodations. Get to this ultimate point. What is it about pregnancy that is different than everything else? Why is it continued to be treated differently? It shouldn't be. The Supreme Court said in the Young v. UPS case, if you can do it for workers' comp, you do it for pregnancy, and I appreciate your time. Thank you. Thank you very much, Counsel. Any further questions, Justice DeArmond? Nope. Justice Mansell? No. Thank you. Thank you, Counsel, both of you, for your arguments this morning. The court will take the matter under advisement and render a decision in due course.